## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>LAWRENCE P. SCHMIDT; FUTUREGEN COMPANY d/b/a FUTUREGEN CAPITAL; COMMERCIAL EQUITY PARTNERS, LTD.; FGC DISTRESSED ASSETS INVESTMENT #1, LLC; FUTUREGEN CAPITAL DDA CG FUND LLC; FGC TAX LIEN FUND #2, LLC; FGC TRADING FUND #1 LLC; FGC SPE NO 1 LLC; FGC SPE NO 2 LLC; AND FGC CM NOTE FUND LLC,<br><br>Defendants. | Case No. _____ |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1.      This matter involves an offering fraud scheme devised and orchestrated by Defendant Lawrence P. Schmidt ("Schmidt").  Schmidt defrauded investors by creating a web of seemingly legitimate companies that were in fact simply designed to entice investment and conceal his misuse and commingling of funds.  Over a six year period, from 2008 through 2014, Schmidt raised nearly $22 million from over 200 unsuspecting investors, siphoning off almost $2 million for

his own benefit, paying old investors with new investor money and ultimately firing all his employees and fleeing the country when his scheme collapsed.

2.     Schmidt owned and controlled Defendants FutureGen Company d/b/a FutureGen Capital ("FutureGen") and Commercial Equity Partners, Ltd. ("Commercial Partners"). Schmidt also created and controlled a series of affiliated entities to carry out his fraud, including: FGC Distressed Assets Investment #1, LLC; FutureGen Capital DDA CG Fund LLC; FGC Tax Lien Fund #2, LLC; FGC Trading Fund #1 LLC; FGC SPE NO 1 LLC; FGC SPE NO 2 LLC; and FGC CM Note Fund LLC (collectively the "FutureGen Funds") (collectively with FutureGen and Commercial Partners (the "Corporate Defendants")).

3.     In May 2008, struggling financially and having filed for personal bankruptcy a few months earlier, Schmidt formed Commercial Partners and began the fraudulent scheme. Commercial Partners' supposed business model was to issue debt securities to investors, many of whom were unsophisticated with limited assets, promising to pay a fixed rate of return, and invest those funds in tax liens.   Schmidt failed to register these securities offerings with the Commission.

4.     Commercial Partners' website boasted of an experienced management team that predated Schmidt's arrival at the company and identified Schmidt as only the Senior Vice President for Tax Liens. That was a lie calculated to reassure and deceive investors; the management team was a fabrication. The management biographies were copied from the résumés of unaffiliated individuals in the banking industry. Schmidt concealed from investors not only his own personal financial difficulties, but also prior criminal history and securities regulatory actions.

5.     In 2009, Schmidt formed FutureGen, which, although technically a separate entity, was effectively the successor to Commercial Partners. Subsequently, he formed the various FutureGen Funds. FutureGen and the FutureGen Funds operated in the same manner as

Commercial Partners, issuing debt securities to investors, promising to pay a fixed rate of return, and claiming to invest the money in the asset line designated by the investor, such as tax liens, commercial mortgages, and distressed debt. Again, Schmidt failed to register these offerings with the Commission.

6.     Despite creating a purported series of separate funds, Schmidt and the Corporate Defendants commingled the funds received from investors and failed to use the funds as promised. Rather than using the funds as represented to investors, the defendants paid back earlier investors with new investor funds, with Schmidt siphoning off about $1.7 million in salary, additional payments to himself, and payments to third-parties on his behalf for expenses such as mortgage payments on a home in Georgia and rent for his residences in Washington, DC.

7.     As the scheme continued, in an effort to perpetuate the enterprise, the defendants promised new investors returns that simply were not possible given the amounts owed to previous investors, the amount of investor funds actually invested in income producing assets, and the rate of return on existing, limited assets.

8.     In the face of regulatory scrutiny, a lack of new investors and massive obligations to existing investors, Schmidt fled the country in April 2014.

9.     At the time he fled, Schmidt acknowledged his misconduct and admitted that the liabilities of the Corporate Defendants dwarfed their assets. In a letter to his goddaughter, Schmidt admitted making many mistakes over the past six years, apologized, begged forgiveness, and stated: "At this point in my life I have three choices, suicide, prison more than likely or to try to start over and make ever [sic] right by everyone."

10.     In an email to FutureGen's part-time accountant, dated the day after Schmidt fled the country, Schmidt wrote: "I went through the book and we owe investors like $13 Mil and only have

about $7 Mil in Assets.  I don't know how I let it get to this. . . . I have to figure out a way to make

this money back, but so much pressure.  I feel like I have failed everyone....We have assets but I

can't be trusted to manage this."

      11.      As a result of the conduct described in this Complaint, Defendant Schmidt and the

Corporate Defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933

("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5].  In addition, Defendant Schmidt is liable as a controlling person under Section 20(a)

of the Exchange Act [15 U.S.C. § 78t(a)].  Defendant Schmidt is also liable, under Section 20(e) of

the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting the violations of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by the

Corporate Defendants.

<strong><u>JURISDICTION AND VENUE</u></strong>

      12.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the

Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C.

§ 78u(d)] to enjoin such acts, transactions, practices, and courses of business, to obtain

disgorgement and civil penalties, and for other appropriate relief.

      13.      This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§ 78u(d), 78u(e), and 78aa].

      14.      Venue lies in this judicial district pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendant Schmidt

resides in this district and, since 2009, this district has been the principal place of business for the

4

Corporate Defendants.  In addition, certain of the acts, transactions, practices, and courses of

business constituting the violations of the federal securities laws charged herein occurred within this

judicial district.

16.    In connection with the conduct alleged in this complaint, Schmidt and the Corporate

Defendants, directly or indirectly, singly or in concert, made use of the means or instruments of

transportation or communication in, or instrumentalities of, interstate commerce, or the mails, or the

facilities of a national securities exchange.

## DEFENDANTS

16.    **Lawrence Paul Schmidt**, age 54, is the owner and President of FutureGen and

Commercial Partners.  Schmidt was responsible for the day-to-day operations of both FutureGen

and Commercial Partners.  He owned FutureGen, which operated the FutureGen Funds.  Schmidt is

a resident of Washington, DC.

17.    **Commercial Equity Partners, Ltd.** is a Delaware corporation with its principal

place of business in Washington, DC.

18.    **FutureGen Company d/b/a FutureGen Capital** is a Delaware Corporation with

its principal place of business in Washington, DC.  FutureGen was formed in September 2009.

19.    **FGC Distressed Assets Investment #1, LLC** is a Delaware Limited Liability

Company with its principal place of business in Washington, DC.  It was formed on May 20, 2010.

20.    **FutureGen Capital DDA CG Fund LLC** is a Delaware Limited Liability

Company with its principal place of business in Washington, DC.  It was formed on August 17,

2010.

21.    **FGC Tax Lien Fund #2, LLC** is a Delaware Limited Liability Company with its

principal place of business in Washington, DC.  It was formed on August 24, 2011.

22.     **FGC Trading Fund #1 LLC** is a Delaware Limited Liability Company with its principal place of business in Washington, DC.  It was formed on January 20, 2012

23.     **FGC SPE NO 1 LLC** is a Delaware Limited Liability Company with its principal place of business in Washington, DC.  It was formed on November 11, 2012.

24.     **FGC SPE NO 2 LLC** is a Delaware Limited Liability Company with its principal place of business in Washington, DC.  It was formed on November 11, 2012.

25.     **FGC CM Note Fund LLC** is a Nevada Limited Liability Company with its principal place of business in Washington, DC.  It was formed on May 17, 2013.

## FACTS

**I.      Schmidt's History Of Violating The Law, Prior Regulatory Sanctions, And Bankruptcy**

26.     In the 1980s and early 1990s, Schmidt amassed a lengthy criminal record.  He has been criminally convicted of crimes involving dishonesty, such as check fraud, at least six times.

27.     In 2003, the Pennsylvania Securities Commission issued a cease and desist order against Schmidt and ATC Investment Group, LLC ("ATC"), a company operated by Schmidt, finding that Schmidt was attempting to raise money from investors to expand ATC's payday advance activities, and that he emailed and sent offering materials to at least one Pennsylvania resident who had no pre-existing relationship with either Schmidt or ATC and who did not have sufficient experience in financial matters to be capable of evaluating the merits and risks of the investment.  The order required Schmidt and ATC to stop offering or selling the investments in Pennsylvania.

28.     The following year, the Tennessee Securities Division issued a cease and desist order against Schmidt, ATC, and a related entity called Pilatus Financial Center, finding that they

were offering unregistered securities by making material misstatements and omissions concerning

the registration status of the securities and guaranteed rates of return.

29.     In 2005, Schmidt attempted to start an on-line, for-profit college named "St. James

Business College, Ltd."

30.     In February 2008, Schmidt filed a bankruptcy petition on behalf of himself and

Dawn Kil, his purported wife.  Kil claims that Schmidt filed the petition without her knowledge and

forged her name.  The bankruptcy proceeding was dismissed the next month for failure to pay filing

fees.

**II.     Defendants Violated The Securities Act By Offering To Sell and Selling Unregistered Securities**

31.     The Defendants sold or offered to sell the Corporate Defendants' promissory notes

("the notes"), even though no registration statement was in effect for the offer or sale of the notes

and the notes were not exempt from the registration requirements of the Securities Act.  In

connection with these sales or offers to sell, the Defendants made use of means or instruments of

interstate transportation, or communication, or of the mails, including using the internet, interstate

phone calls, and U.S. mail.

32.     During the relevant period, Schmidt and the Corporate Defendants raised nearly

$22 million through the sale of the notes to over 200 investors, including both accredited and

unaccredited investors.  These investors resided in more than twenty states.

33.     The notes set forth the investment amount and other terms, including, for instance,

the interest rate and maturity date.  The notes had interest rates ranging from approximately 7% to

13% annually.  Schmidt and the Corporate Defendants did not provide investors with financial

reports or other similar written financial information in connection with the sale of the notes.

34.     The notes sold to investors by the Defendants are securities within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], and the fraud and other misconduct described herein was in the offer of, and/or in connection with the purchase or sale of securities.

### III.     Schmidt And The Corporate Defendants Defrauded Investors

**Schmidt And Commercial Partners Made Material Misrepresentations To Investors and Omitted To State Material Facts Necessary To Make Other Statements Not Misleading Under The Circumstances**

35.     In May 2008, Schmidt formed Commercial Partners.  At the time it was formed, Schmidt was the lone director of the company.

36.     Commercial Partners maintained a website and solicited investors, in part, through pop-up internet advertisements that directed potential investors to the Commercial Partners website.

37.     Schmidt fabricated a leadership team for Commercial Partners.  Although Schmidt owned, controlled, and operated Commercial Partners, the Commerical Partners website falsely identified other individuals as holding various leadership positions at the company, such as Chairman, President, and Chief Accounting Officer.  Schmidt copied the biographical information from unaffiliated individuals in the banking industry and attributed it to the fictitious management team.  In some instances, Schmidt used an unaffiliated individual's name as well.

38.     For example, the Commercial Partners website listed "Lawrence St. James" as the chairman of the company.  But Lawrence St. James does not exist.  The biographical information attributed to St. James on the Commercial Partners website was copied from the website of another individual who worked for an unrelated company

39.     Schmidt concealed his ownership and control of Commercial Partners behind the fictitious management team.  Commercial Partners' website described Schmidt only as the Senior

Vice President of the Tax Lien Department, and claimed that he joined the company after the fictional management team. When questioned under oath about the purported management team for Commercial Partners, Schmidt asserted his Fifth Amendment privilege against self-incrimination.

40.     In addition to the false statements about Commercial Partners' management, Schmidt and Commercial Partners knowingly or recklessly made false and/or misleading statements to investors when soliciting their investments. Schmidt and Commercial Partners, directly and through salespeople employed by Commercial Partners, sold notes to investors, who transferred funds to Commercial Partners for a certain period of time to be invested, and, in turn, would be entitled to the return of their principal plus interest at the end of the term. Investors had the option of receiving periodic interest payments, or having that interest reinvested and paid at the end of the investment term.

41.     Investor funds were to be pooled by Commercial Partners to purchase tax liens. In general, tax liens are placed on the properties of homeowners who fail to make their property tax payments to local governments. The liens require the homeowner to pay the taxes plus interest and penalties or eventually face foreclosure after a number of years of nonpayment. Rather than wait for repayment or foreclosure, some local governments will sell the liens to private parties who bid to purchase the liens at auctions. Bidders on the liens at auction agree to pay the back taxes and then bid down the interest they would collect on the lien. The winner of the auction is then entitled to collection rights of the tax payment from the homeowner plus the winning interest rate and, depending upon the municipality, penalties assessed.

42.     Although the majority of tax liens are eventually redeemed by the homeowner before a property can be foreclosed upon, there are cases in which the lien is not paid and the lienholder may have to foreclose. However, the lienholder often must pay the subsequent years of

unpaid taxes until the possible foreclosure or lose its place in order of repayment as well as its right to foreclose.

43.     In connection with making this investment with Commercial Partners, each investor signed a debt investment agreement ("the Commercial Partners agreement"), which was electronically countersigned by Commercial Partners with the name "Lawrence St. James." That signature alone makes the Commercial Partners agreement misleading because Lawrence St. James does not exist.

44.     The Commercial Partners agreement makes additional misstatements of material fact and omits to state material facts that are necessary to make the statements made not misleading under the circumstances by failing to disclose that Schmidt, an owner, director, and officer of Commercial Partners, filed for bankruptcy and that he was the subject of disciplinary proceedings by two state securities agencies.  Specifically, the Commercial Partners agreement states that:

> It is hereby certified that in the previous six years there has been no Bankruptcy or Insolvency Proceedings, voluntary or otherwise against any Directors, General Partners or Officers of Commercial Equity Partners Ltd. or against any partnerships involving the above named parties or against any of the above named parties personally.

The Commercial Partners agreement also states that:

> It is hereby certified that none of the General Partners or Officers of Commercial Equity Partners, Ltd. itself, has any pending liability in any civil action for Misrepresentation, Unfair or Deceptive Business Practices or violating any law regulating franchises or businesses, including a failure to provide proper disclosure to an investor.

45.     At a minimum, these statements are misleading because Commercial Partners failed to disclose Schmidt's bankruptcy petition, the actions brought against him by the Pennsylvania and Tennessee state securities agencies, and his criminal record.

### Schmidt Continued And Expanded His Fraudulent Scheme Through FutureGen And The FutureGen Funds

46.     Schmidt formed FutureGen in September 2009.  He has owned, controlled, and operated FutureGen since its inception.

47.     Although formed as a separate entity, FutureGen is effectively the successor to Commercial Partners.  FutureGen absorbed Commercial Partners' employees, who continued to service both FutureGen's and Commercial Partners' investors.

48.     In addition to servicing Commercial Partners' investors, FutureGen purported to offer four investment programs of its own: tax liens, commercial bridge and multi-family property loans, a blend of those two categories, and a distressed debt asset fund.

49.     Investors in the various asset lines were supposed to have their money pooled with other investors and used to invest in the asset line(s) they selected.  Investors and FutureGen and/or one of the FutureGen Funds executed a promissory note reflecting the investment including the specific asset line.

### Schmidt, FutureGen, And The FutureGen Funds Made Material Misrepresentations To Investors and Omitted To State Material Facts Necessary To Make Other Statements Not Misleading Under The Circumstances

50.     Under FutureGen's so-called "trust deed investment" program, FutureGen promised to pool investor funds to provide short term bridge financing for real estate purchases and improvements.  FutureGen's offering materials represented to investors that their investments would be secured by the properties underlying the loans.  In addition, the FutureGen notes for the trust deed investment program stated: the "Note Holder is considered in first position on the property

locations to be determined by the mortgage underwritten by FutureGen Capital in future transactions and pooled with other investor(s) funds.  If the funds are used to replace the funds of another investor at the end of their term, you will have a separate indication here." All known notes provided to an investor failed to disclose that the investor's funds were being used to pay earlier investors.

51.     The representations that investors' funds would be used to invest in such loans, that the investment would be secured by real property, and, therefore, that the monies would not be used to pay an earlier investor were false or misleading.  Moreover, contrary to the Defendants' representations, the investors's individual investment was not secured by the property underlying the loan.

52.     Further, FutureGen did not invest the investor money as promised.  For example, between June 2013 and April 2014, FutureGen raised at least $3.4 million for its trust deed program, but only invested approximately $2.4 million of those funds in real estate transactions.  As FutureGen has no remaining capital in its accounts, the $1 million is not being held for future investment.  Instead, FutureGen used the remaining $1 million in a failed attempt to maintain the faltering operations of the Corporate Defendants and to repay earlier investors in the Corporate Defendants' notes.

53.     No later than December 2013, the Corporate Defendants became unable to meet all their obligations as they became due.  That month, FutureGen failed to return over $90,000 owed to an investor who directed his investment to the distressed debt investment line.  The next month, FutureGen failed to return over $110,000 owed to an investor who directed his investment to the tax lien investment line.  Despite the inability to pay existing investors from their operations, FutureGen

and the FutureGen Funds continued to solicit and accept funds from new investors without disclosing that the Corporate Defendants could not meet their obligations to existing investors.

54.     In addition, in an effort to deceive investors into believing that their individual investment was secured, FutureGen offered investors the option to have the company file a UCC-1 financing statement with the state of Delaware on their behalf. However, Defendants did not file a UCC-1 for every investor who elected that option. Moreover, contrary to Defendants' explicit and/or implicit representations, the UCC-1 did not give the investor a security interest in property underlying loans financed by the company or connected to tax liens, it merely gave notice of an interest in FutureGen's assets.

55.     Moreover, as with Commercial Partners, FutureGen and the FutureGen Funds failed to disclose the prior bankruptcy of Schmidt, the actions taken against him by state securities agencies, or his criminal history. In light of Schmidt's key position in managing FutureGen and the FutureGen Funds and holding himself out as qualified to manage millions of dollars, those omissions rendered Defendants' statements, both explicit and implicit, about their business and Schmidt's qualifications materially misleading.

56.     Pursuant to subpoena and before he fled the country, the Commission staff took Schmidt's testimony under oath. Schmidt asserted his Fifth Amendment privilege and declined to answer any substantive questions about the Corporate Defendants and the conduct described in this complaint. For example, when asked whether the Corporate Defendants commingled funds, Schmidt asserted his Fifth Amendment privilege. He did the same when asked whether investor funds were used to pay his personal expenses; and, again, when asked if investor funds were transferred to his personal bank account.

57.     By December 2013 at the latest, Schmidt knew that the Corporate Defendants could no longer meet all their obligations.  Nevertheless, Schmidt continued raising money from investors and failed to disclose the material facts regarding the Corporate Defendants' financial condition.

### Schmidt Operated The Corporate Defendants As One Enterprise

58.     Like Commercial Partners, FutureGen and the FutureGen Funds were the alter-egos of Schmidt.  Similar to the fictitious executives Schmidt created for Commercial Partners, between 2009 through 2013, Schmidt created the FutureGen Funds to obscure his scheme behind a veil of legitimacy and sophistication.  He dominated and controlled the entities, disregarded the corporate form, and operated the Corporate Defendants as a single enterprise.

59.     As the lone signatory on the various bank accounts held in the name of these entities, Schmidt controlled the flow of money, commingling it among the various accounts in the names of the Corporate Defendants and allocating it as he wished, including lining his own pockets through direct and indirect payments.

### Schmidt Took Steps To Conceal The Fraud

60.     Schmidt, acting on behalf of himself and the Corporate Defendants, attempted to conceal the fraud by lying to one or more investors regarding the Commission staff's investigation.

61.     For example, in April 2014, Schmidt lied to an investment advisor, with clients invested in the Corporate Defendants, about the nature and scope of the Commission staff's investigation.  After learning of the Commission staff's investigation, the investment advisor sought an explanation from Schmidt.  In a letter to the investment advisor dated April 8, 2014, Schmidt responded that: (1) the staff was only conducting an informal investigation concerning possible registration violations at Commercial Partners; (2) the investigation did not involve FutureGen; and (3) the staff had not requested documents from FutureGen.

14

62.     When Schmidt made these statements, he knew they were false.  Prior to making the statements, Schmidt was presented with documentation that the investigation pertained to FutureGen.  He knew about the subpoena requesting documents from FutureGen.  And, during his testimony before the Commission staff, the staff questioned Schmidt at length about the subpoena to FutureGen and potential misstatements or omissions by both him and the Corporate Defendants; he asserted his Fifth Amendment privilege against self-incrimination in response to those questions.

**No One Is Managing The Corporate Defendants Or The Assets They Currently Hold**

63.     Around the time he fled the country, Schmidt sent letters to nearly all of FutureGen's employees, terminating their employment.  The one former employee who told the Commission staff that he did not receive a termination letter is the company's part-time accountant, and he subsequently resigned.  At the same time, Schmidt also sent letters to FutureGen's investors, advising them that he was no longer accepting investments and was closing the company.

64.     In an email to the part-time accountant at the time that he fled, Schmidt stated that the Corporate Defendants owed investors approximately $13 million, but only had approximately $7 million in assets.  Schmidt concluded:  "We have assets but I can't be trusted to manage this."

65.     Until May 2, 2014, the companies were represented by previously retained counsel, who also represented Schmidt and represented the individual FutureGen employees in their dealings with the Commission staff.  On May 2, counsel advised the staff that he no longer represents the companies or Schmidt.

66.     Accordingly, no one is operating the Corporate Defendants or the assets they hold, which include assets that require management.

## Schmidt And The Corporate Defendants Defrauded Investors

67.     During the relevant period, Schmidt operated and controlled the Corporate Defendants.

68.     All of the misrepresentations and omissions set forth herein, individually and in the aggregate, are material.  There is a substantial likelihood that a reasonable investor would consider the misrepresented facts and omitted information important, and/or that disclosure of the omitted facts or accurate information would alter the "total mix" of information available to investors.

69.     In connection with the conduct described herein, Defendants acted knowingly and/or recklessly.  Among other things, Defendants knew or were reckless in not knowing that they were making material misrepresentations and omitting to state material facts necessary to make certain statements not misleading under the circumstances in connection with selling or offering to sell the notes to investors.

70.     Through their material misrepresentations and omissions, Defendants knowingly, recklessly, or negligently obtained money or property from investors.  The Corporate Defendants took approximately $22 million from investors, and Schmidt kept approximately $1.7 million or more for himself.

71.     Through this scheme, Defendants knowingly, recklessly, or negligently engaged in acts, transactions or courses of business that operated as a fraud or deceit upon offerees, purchasers and prospective purchasers of the Corporate Defendants' notes.

## FIRST CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Against All Defendants)

72.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 71, above, as if the same were fully set forth herein.

16

73.     As a result of the conduct alleged herein, Defendants Schmidt, FutureGen, the FutureGen Funds, and Commercial Partners, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

74.     No valid registration statement has been filed with the Commission or has been in effect with respect to any offering or sale alleged herein.

75.     By engaging in the foregoing conduct, Defendants Schmidt, FutureGen, the FutureGen Funds, and Commercial Partners violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### SECOND CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (Against All Defendants)

76.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 75, above, as if the same were fully set forth herein.

77.     From at least 2008 through April 2014, as a result of the conduct alleged herein, Defendants Schmidt, FutureGen, the FutureGen Funds, and Commercial Partners knowingly or recklessly or, with respect to subparts b and c below, negligently, in the offer or sale of securities, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

a.     employed devices, schemes or artifices to defraud;

b.     obtained money or property by means of, or made, untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; or

   c.  engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon offerees, purchasers, and prospective purchasers of securities.

   78.  By engaging in the foregoing conduct, Defendants Schmidt, FutureGen, the FutureGen Funds, and Commercial Partners violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against All Defendants)**

   79.  The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 78, above, as if the same were fully set forth herein.

   80.  From at least 2008 through April 2014, as a result of the conduct alleged herein, Defendants Schmidt, FutureGen, the FutureGen Funds, and Commercial Partners, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentality of interstate commerce or of the mails, or a facility of a national securities exchange:

   a.  employed devices, schemes or artifices to defraud;

   b.  made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

   c.  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

18

81.     By engaging in the foregoing conduct, Defendants Schmidt, FutureGen, the

FutureGen Funds, and Commercial Partners violated, and unless restrained and enjoined will

continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF
### Controlling Person Liability Under Section 20(a) of the Exchange Act
### (Against Defendant Schmidt)

82.     The Commission realleges and incorporates by reference each and every allegation

in paragraphs 1 through 81, above, as if the same were fully set forth herein.

83.     In addition to his liability under Section 10(b) of the Exchange Act and Rule 10b-5

thereunder, Schmidt is also liable as a controlling person under Section 20(a) of the Exchange Act

[15 U.S.C. § 78t(a)].

84.     Defendant Schmidt is, or was at the time acts and conduct set forth herein were

committed, directly or indirectly, a person who controlled FutureGen, the FutureGen Funds, and

Commercial Partners.  As detailed above, FutureGen, the FutureGen Funds, and Commercial

Partners, sold securities in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and

Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

85.     By reason of the foregoing conduct, Schmidt is jointly and severally liable with, and

to the same extent as, the persons he controlled for violations of Section 10(b) of the Exchange Act

[15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Liability Under Section 20(e) of the Exchange Act
### (Against Defendant Schmidt)

86.     The Commission realleges and incorporates by reference each and every allegation

in paragraphs 1 through 85, above, as if the same were fully set forth herein.

87.     FutureGen, the FutureGen Funds, and Commercial Partners violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

88.     Defendant Schmidt aided and abetted the violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by FutureGen, the FutureGen Funds, and Commercial Partners.

89.     Defendant Schmidt was aware that his role was part of an overall activity that was improper.

90.     Defendant Schmidt knowingly and substantially assisted FutureGen, the FutureGen Funds, and Commercial Partners in their respective violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants Schmidt, FutureGen, the FutureGen Funds, and Commercial Partners from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering Defendants Schmidt, FutureGen, the FutureGen Funds, and Commercial Partners to disgorge any and all ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint.

**III.**

Ordering Defendants Schmidt, FutureGen, the FutureGen Funds, and Commercial

Partners to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)]

and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**IV.**

Permanently barring Schmidt from acting as an officer or director of any issuer that has a

class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] that is

required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to

Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange

Act [15 U.S.C. § 78u(d)(2)];

**V.**

Retaining jurisdiction of this action for purposes of enforcing any final judgments and

orders; and

**VI.**

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

Dated:  June 12, 2014

John V. Donnelly III

Attorney for Plaintiff:

**SECURITIES AND EXCHANGE COMMISSION**
Philadelphia Regional Office
One Penn Center
1617 JFK Boulevard, Suite 520
Philadelphia, Pa.  19103
Telephone:  (215) 597-3100
Facsimile:  (215) 597-2740
DonnellyJ@sec.gov

Of Counsel:
Sharon B. Binger
G. Jeffrey Boujoukos
Kingdon Kase
Jack C. Easton

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
One Penn Center
1617 JFK Boulevard, Suite 520
Philadelphia, Pa.  19103
Telephone: (215) 597-3100
Fascimile: (215) 597-2740